JjPEATROSS, Judge.
This is an appeal by the mother from a 1996 judgment terminating her parental rights to her son, D.T., bom October 8,1984, and her daughter, L.T., born April 1, 1988. For the reasons expressed below, we affirm.
FACTS
On October 30, 1991, the Department of Social Services, State of Louisiana (“DSS”), received an emergency phone call from D.T.’s elementary school reporting alleged physical abuse of seven-year old D.T. D.T.’s teacher reported that the child had been severely beaten and was in pain. Regina Reader, a child protective services worker for DSS, went to the school and interviewed D.T., who reported that he had been beaten with a belt by his mother.
Ms. Reader then talked to the mother, who told Ms. Reader that she did beat her children with a switch. Ms. Reader transported the mother, D.T. and L.T., the mother’s younger child, to North Caddo Hospital, where D.T. was examined. While at the hospital, Ms. Reader personally observed and *667 photographed D.T.’s injuries. According to Ms. Reader, on the way to the hospital, the mother hit three-year old L.T. several times with her open hand in an attempt to control L.T.’s behavior.
An oral instanter order was issued and, after a hearing on November 4, 1991, the children were placed into the custody of DSS. On November 7, 1991, the children were examined by Dr. Robert Savory, who found that L.T. had a recent burn mark and whiplash injuries to her upper right thigh and that D.T. had severe injuries to his back and whiplash injuries to his leg, chest and back. The history given indicated that D.T.’s injuries were the result of a beating by his mother. Both children were adjudicated in need of care on January 31, 1992, and have remained in the State’s custody through the time of the trial.
^Subsequent to the children’s adjudication, DSS provided services to the mother in an attempt to reunify her with the children. A psychological evaluation by Dr. Donita Goth-ard, an expert in the field of educational counseling and psychology, revealed that the mother’s IQ was approximately 60, which is considered “mildly mentally retarded.” Further testing by Dr. David Atkins, a licensed professional counselor who conducted individual counseling with the mother, indicated that her reading ability was on the second grade level. Dr. Gothard felt that the mother’s limited intellectual ability alone did not rule out her ability to parent her children, but recommended the mother attend parenting classes, receive counseling, learn how to maintain adequate housing and demonstrate emotional involvement with her children before their return to her control.
DSS provided the mother parenting classes, individual counseling with two counselors and transportation to scheduled monthly visits with the children. The mother completed the parenting classes and, initially, attended the scheduled visits with the children. After August 1993, however, she no longer regularly attended scheduled visitation with the children. Although the testimony is conflicting as to whether the mother was present at certain visitations and conferences, the testimony indicates that she did not see the children from August 1993 to August 1994.
In April 1993, based on the opinions of counselors and DSS service workers that the mother was not making progress, DSS. made the decision to discontinue efforts at reunification and to seek termination, of the- mother’s parental rights.
On December 30,1993, DSS filed a petition to terminate the parental rights of the mother as to D.T. and L.T. The petition also sought to terminate the mother’s parental rights as to M.T., who was born to the moth- ■ er on December 8, L1991.[1] The petition further sought the termination of the parental rights of Dennis White, the father of D.T., and the termination of the parental rights of Obediah James, the father of L.T.[2]
After a trial, in a judgment rendered on October 16, 1996, the trial court ordered the termination of the parental rights of the mother as to D.T. and L.T. and the termination of the parental rights of Dennis White as to D.T.[3] The trial court signed a written judgment on October 29,1996.
Assigning three assignments of error, the mother appeals from the judgment terminating her parental rights as to her children, D.T. and L.T.
DISCUSSION
In a termination of parental rights case, the state must prove all the elements of its case by clear and convincing evidence. La. Ch. C. art. 1035; State in the Interest of *668 L.L.Z. v. M.Y.S., 620 So.2d 1309 (La.1993); State in the Interest of S.C. v. D.N.C., 26,104 (La.App.2d Cir. 6/22/94), 639 So.2d 426, writ denied, 94-1977 (La.11/4/94), 644 So.2d 1061. The evidence must allow the conclusion that termination is in the best interest of the child. State in the Interest of S.C. v. D.N.C., supra; State in the Interest of A.M.M., 622 So.2d 1217 (La.App. 2d Cir.1993).
A trial court’s factual determinations, including whether a parent is unfit and whether there is a reasonable expectation bf reformation, will not be set aside in the absence of manifest error. State in the Interest of TD v. Webb, 28,471 (La.App.2d Cir. 5/8/96), 674 So.2d 1077; State in the Interest of S.C. v. D.N.C., Lsupra. Great weight is attached to the exercise of the trial judge’s discretion, which will not be disturbed on review if reasonable men could differ as to the propriety of the trial court’s action. On the other hand, the discretion vested in the trial court must be exercised in whole-heart-ed good faith and be guided by the statutes, not by the court’s private opinion of what the statute ought to be. Where the exercise of discretion is arbitrary and not judicial, and the judgment is unjust, it will be set aside. State v. Talbot, 408 So.2d 861 (La.1980) on rehearing; State of Louisiana in the Interest of KLB v. Biggs, 29,512 (La.App.2d Cir. 2/28/97), 690 So.2d 965.
La. Ch. C. art. 1015 provides the grounds for the involuntary termination of parental rights. In his written reasons for judgment, the trial judge found that termination was proper under both Subparagraph (4) of La. Ch. C. art. 1015 (“Section 4”) and Subpara-graph (5) of La. Ch. C. art. 1015 (“Section 5”).
La. Ch. C. Art. 1015 provides, in pertinent part:
The grounds set forth in the petition must meet all of the conditions of any one of the following Paragraphs:
******
(4) Prior adjudications as a child in need of care
(a)One year has elapsed since a child in need of care adjudication.
(b) The parent is unfit to retain parental control.
(c) The parent has shown no significant, substantial indication of reformation, and there is no reasonable expectation of his reformation in the foreseeable future.
(5) Prior adjudication as a child in need of care and removal from the parental home
(a) One year has elapsed since a child was removed from the parent’s custody pursuant to a court order in a child in need of care proceeding and placed either in the custody of an agency or individual.
|6(b) The parent is now unfit to retain parental control, and there is no reasonable expectation of his reformation in the foreseeable future.
(c) The department has made every reasonable effort to reunite the child with his parents to no avail but now recommends that reunification would not be in the best interests of the child.
In her first assignment of error, the mother argues that the trial court erred in finding Section 4 to be applicable to the instant case. She urges that because the children had been removed from the parental home, Section 5 is the exclusively applicable section.
We acknowledge that some discrepancy exists in the jurisprudence of this court regarding the applicable section of Article 1015 when the child has been removed from the parental home. In State in the Interest of A.M.M., supra, this court allowed the application of Section 4 as the basis for the termination of parental rights as to a child who had been removed from the parental home. In a number of eases, however, this court has held that Section 5 is the appropriate ground on which to terminate parental rights when the child has been removed from the parental home. See, for example, State in the Interest of TD v. Webb, supra; State in the Interest of S.C. v. D.N.C., supra; State in the Interest of V.T., 609 So.2d 1105 (La.App. 2d Cir.1992).
*669 A comparison of the elements of Section 4 and Section 5 shows that Section 5 is properly applicable when the child has been removed from the parental home and that Section 4 is directed at situations in which the children have remained in the parental home. In the instant case, the children were removed from the parental home, thus, Section 5 is the applicable provision.
We note, however, that the fulfillment of any one subsection of La. Ch. C. art. 1015 is sufficient to justify the termination of parental rights. State in the Interest of S.C. v. D.N.C., supra; State in the Interest of V.T., supra. The fact that |6the trial court incorrectly found Section 4 applicable does not necessarily render its judgment in error, because the requirements of Section 5 were also found to be met. We examine, therefore, whether the trial court was manifestly erroneous in its determination that grounds for involuntary termination exist under Section 5.
For termination to be proper, the State must have proven all of the required elements of the section. Section 5(a) requires that one year shall have elapsed since the removal of the children from the parent’s custody pursuant to a court order in a child in need of care proceeding and placement either in the custody of an agency or individual. In this ease, the record clearly establishes, and neither party contests, that this requirement has been satisfied. The children were removed from the mother’s custody pursuant to an instanter order issued on October 30, 1991, and have remained in the State’s custody since that time. On January 31, 1992, the children were adjudicated in need of care. The petition for termination of parental rights was filed on December 30, 1993. Consequently, more than one year had elapsed between the date of removal of the children from the mother’s custody pursuant to a court order in a child in need of care proceeding and the date of filing of the petition herein.
Section 5(b) requires the State to prove the mother is unfit to retain parental control. In her second assignment of error, the mother argues that the trial court erred in finding her “unfit” as defined by La. Ch. C. art. 1003(10)(c).
La. Ch. C. art. 1003 provides, in pertinent part:
‡ ‡ ‡ í Í
(10) “Unfit” refers to any of the following behaviors or conditions of a parent:
* sfc * * * *
(c) Whose medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, substance abuse, or chemical dependency makes the parent unable or unwilling to provide an adequate permanent home for the child at the present time |7or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior.
The mother contends that the trial court impermissibly based its finding of “unfitness” upon her behavior, rather than a “behavior disorder,” which she argues is required by La. Ch. C. art. 1003(10)(c).
This court has previously found that evidence of a mother’s behavior pattern was sufficient to support a finding that the parent’s behavior or conduct disorder made her unable or unwilling to provide an adequate home for the child. State in the Interest of TD v. Webb, supra; State in the Interest of J.L.N., 27,568 (La.App.2d Cir. 6/21/95), 658 So.2d 272.
In the present ease, the State presented the testimony of experts who expressed grave concerns for the mother’s ability to care for her children. Dr. Gothard testified that the mother’s attitude towards her children showed disassoeiation and a lack of mother/child bonding. Dr. Gothard further stated that, before the children were returned to the mother, the mother should demonstrate parenting skills, child rearing practices and emotional involvement with the children.
Dr. Bruce McCormick, an expert in the field of child and adolescent psychology, also evaluated the mother. He stated that she would have significant difficulty acquiring new information due to her limited intellectual capabilities and that she did not have the *670 general ability to perform well in other than routine tasks. Dr. McCormick further testified that he would predict that the mother would have difficulty implementing any type of changes in her lifestyle. In Dr. McCormick’s opinion, the likelihood of the mother providing for the social, emotional and supervisory needs of the two children was “very, very questionable.”
Dr. Atkins testified that the mother’s mental ability alone would not prevent her from being an effective parent, but she had only minimal parenting skills andjgdid not have much awareness of her children’s intellectual needs. Compared to most mentally impaired people, Dr. Atkins found the mother to be “more uninvolved, disinterested, unmotivated and ambivalent regarding her role as a parent and her interest in the children.” During counseling sessions with Dr. Atkins, the mother continued to deny any knowledge or responsibility for any abuse that had occurred, a significant factor which made therapeutic changes difficult. Dr. Atkins further testified that he felt the mother had no motivation to make personal changes toward rehabilitating herself for the return of her children.
The testimony by two of the children’s foster mothers indicated that the mother showed little interest in the children during visits. Ms. Corinne Anderson, who had been L.T.’s foster mother since January 1995, testified that during the family visits which she observed, the mother showed little “connection” with the children. Ms. Penny Butler, who was D.T.’s foster mother at the time of the trial, testified that the mother attended approximately less than half of the family visitation sessions during the time D.T. was in her home. She further testified that at the family conference in October 1995, the mother and D.T. had a verbal confrontation in which the mother told D.T. that she hated him. Ms. Butler also stated that on other visits the mother was withdrawn and had little, if any, contact with the children.
Ms. Lynn Curran, the foster care ease manager for D.T. and L.T. since their adjudication as children in need of care in 1991, testified that, with the exception of one occasion, the mother refused to allow her entrance into the family home and that the mother had made no progress in correcting her home situation. She further stated that the mother seemed to have little attachment to the children and had shown little interest in them for over a year.
The evidence presented by the State showed that, in spite of individual counseling and an extended period of time over which to achieve positive change, | pthe mother has shown little, if any, motivation to rehabilitate herself. Given the evidence presented, we cannot say that the trial court was clearly wrong in finding that the State had proven the mother unfit to retain parental control. This assignment of error lacks merit.
Section 5(b) further requires that the state show that there is no reasonable expectation of reformation in the foreseeable future. Reformation sufficient to prevent termination of parental rights requires that the parent demonstrate a substantial change, such as significantly altering or modifying that behavior which served as the basis for, and resulted in, the state’s removal of the child from the home. State in the Interest of TD v. Webb, supra; State in the Interest of E.G., 95-0018 (La.App. 1st Cir. 6/23/95), 657 So.2d 1094, writ denied, 95-1865 (La.9/1/95), 658 So.2d 1263.
A parent who professes an intention to exercise his or her parental rights and responsibilities must take some action in furtherance of the intention to avoid having those rights terminated, even when the parent is mentally ill or impaired. State in the Interest of J.L.N., supra. See also State in Interest of Four Minor Children v. D.W., 585 So.2d 1222 (La.App. 2d Cir.1991).
In the instant case, the trial court found a lack of a substantive indication of the mother’s reformation or of a reasonable expectation of her reformation in the foreseeable future. Of significance to the trial court was the mother’s lack of desire to implement new parenting skills and the fact that she was discharged by two counselors due to a lack of motivation and substantive progress. Dr. McCormick testified that he was doubtful that the mother had the ability to provide the consistency and skills needed to parent the *671 two children. Dr. AtMns opined that it was highly doubtful that the mother would change. Based on the evidence presented, we cannot say that the trial court erred in finding there is no | ^substantial indication of reformation and no reasonable expectation of reformation in the foreseeable future. Thus, the requirements of Section 5(b) are met.
Section 5(e) requires that the department have made every reasonable effort to reunite the child with his parents to no avail but now recommends that reunification would not be in the best interests of the child. The mother argues that the State failed to make every reasonable effort at reunification by (1) failing to modify parenting and counseling classes to accommodate her special intellectual needs due to her mental retardation and/or (2) failing to obtain a physical medical examination to rule out physical causes for her behavior upon which the termination was based.
The record shows, and the trial court found, that the parenting classes which the mother attended were not modified to accommodate her intellectual abilities. The instructors of the parenting class indicated that they were not made aware of the mother’s mental deficiency and did not adjust the class accordingly. The classes were taught largely in a lecture format, with handouts given to the participants. After the lecture, the participants would divide into small groups, placing their chairs in a circle and discussing various pertinent topics. The class instructor testified, however, that the mother would not participate at all within the group setting and that the mother often lay her head on her desk, occasionally sleeping during class. The instructor further testified that, although the mother at times seemed to have difficulty understanding the materials, assessment of whether the material was beneficial to her was difficult because of her lack of participation.
The evidence shows that, although the mother attended the parenting classes, she did not participate in discussions, occasionally slept through the classes and failed to voice any concerns about not understanding the materials. The trial court was not clearly wrong in finding the State did not fail in its | nobligation to make every reasonable effort by not modifying the parenting classes to accommodate the mother’s intellectual ability.
Regarding the allegation that the State failed to modify “counseling classes” to accommodate the mother’s intellectual ability, the evidence does not support this claim. DSS offered the mother individual counseling with two different counselors. First, the mother was counseled by Dr. David Atkins, whose experience in counseling included working with mentally retarded or mentally impaired persons; he had been a consultant for approximately fourteen years to several community homes which provide care and treatment to the mentally impaired. After four counseling sessions with the mother, Dr. Atkins terminated the sessions because the mother had shown a complete absence of motivation to learn or to make personal changes.
In spite of the fact that Dr. Atkins felt the mother had demonstrated a complete absence of motivation to change, the State gave the mother an opportunity to work with a second counselor. Ms. Lyn Curran testified that this second opportunity was given to the mother because of her limited mental abilities. The second counselor, Ms. Pat Cover, was a specialized foster care worker with a Masters in Social Work. In the course of her education, Ms. Cover had attended graduate level classes on mental retardation and had worked with mentally retarded persons. She attempted counseling with the mother and, due to the mother’s limited mental abilities, often used “play therapy” in an attempt to connect with the mother. Ms. Cover terminated the session after six meetings due to the mother’s lack of motivation to improve.
The record indicates that both Dr. Atkins and Ms. Cover counseled the mother on an individual basis. Both counselors were experienced in working with mentally retarded individuals and were aware of her mental limitations. In spite of this individual attention from two professional counselors, the mother failed to l^show motivation to learn or to make personal changes. The State clearly made reasonable efforts regarding the counseling offered the mother.
*672 The mother also contends that the State failed to make “every reasonable effort” at reunification because the mother was not provided with a physical medical examination as recommended by Dr. McCormick as a part of the mother’s case plan.
We note that the State is required to make “every reasonable effort” at reunification, not to pursue every possible avenue of reunification regardless of the likelihood of success. While the record indicates that Dr. McCormick did recommend a physical examination, he testified at trial that he felt it unlikely that the mother had a medical problem. No evidence was presented by the mother to indicate that a physical illness or condition was the cause of her behavior.
The trial court found the State proved by clear and convincing evidence that every reasonable effort at reunification was made, in spite of the fact that no physical examination was provided for the mother. In this ease, the State attempted its reunification process over a several year period. State foster care workers, counselors and psychologists all agreed that the mother refused to act in a positive manner on any of the teachings and suggestions made during the long attempted reunification process. We find no error in the trial court’s finding that the State made every reasonable effort at reunification.
CONCLUSION
For the foregoing reasons, we find the evidence meets the stringent legal standards for terminating the mother’s parental rights as to D.T. and L.T. The judgment of the trial court is affirmed. Costs are assessed against the mother to the extent to which she is financially able. See La. Ch. C. art. 321.
AFFIRMED.

. The trial court dismissed the action regarding the termination of the mother's parental rights as to M.T., as custody and guardianship of M.T. had been voluntarily transferred to M.T.’s paternal grandmother in a judgment signed October 27, 1995.

. The termination of the parental rights of Obedi-ah James as to his daughter L.T. was ordered before the trial on the merits of the part of the case involved in this appeal.

.We note that a fourth child was bom to the mother in August 1993. No termination of the mother's rights as to this child was sought in the instant case.